*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0462a.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

DANTA DAVIS,

> *Petitioner-Appellant,*

        *v.*

No. 03-2262

DENNIS STRAUB, Warden,

> *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-73319—Gerald E. Rosen, District Judge.

Argued: March 17, 2005

Decided and Filed: December 1, 2005

Before: MERRITT and ROGERS, Circuit Judges; HOOD, Chief District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** John R. Minock, CRAMER & MINOCK, Ann Arbor, Michigan, for Appellant. Janet A. Van Cleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** John R. Minock, CRAMER & MINOCK, Ann Arbor, Michigan, for Appellant. Janet A. Van Cleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

ROGERS, J., delivered the opinion of the court, in which HOOD, D. J., joined. MERRITT, J. (pp. 10-16), delivered a separate dissenting opinion.

———————————

**AMENDED OPINION**

———————————

ROGERS, Circuit Judge. Respondent-Appellee Dennis Straub has petitioned for rehearing following this panel's decision to order the district court to grant Petitioner-Appellant Danta Davis's habeas corpus petition. In this case, a Michigan jury convicted Davis of murdering one woman and two children in 1996, and Davis was sentenced to multiple concurrent life sentences. During his joint trial with co-defendant Nathan Bell, Davis sought to have witness Damaris Jourdan testify as to Jourdan's prior statements, which tended to exculpate Davis, made to police and a private investigator. Before Jourdan took the witness stand, the prosecutor, in front of Jourdan, informed

———

[*] The Honorable Joseph M. Hood, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

the court that Jourdan was a suspect and should consult with a lawyer before testifying. Jourdan, after consulting with his lawyer, invoked his Fifth Amendment privilege against self-incrimination. The court stated that "whether or not [Jourdan] testifies is a choice that is his alone," and the court allowed him to make a blanket invocation without taking the stand and responding to individual questions. The state appellate court affirmed Davis' conviction, determining that the trial court committed harmless error by allowing the witness to determine the breadth of the privilege against self-incrimination.

After the district court denied his petition for habeas corpus, this court certified three questions for appeal on habeas review: (1) whether the prosecutor intimidated Jourdan into invoking his privilege against self-incrimination in violation of Davis's right to due process, compulsory process, and presentation of his defense; (2) whether Davis was denied a fair trial and his right to present a defense when the trial court sustained Jourdan's blanket assertion of the privilege against self-incrimination; and (3) whether Davis was deprived of effective assistance of counsel when defense counsel, after failing to object to Jourdan's blanket assertion of his Fifth Amendment right not to incriminate himself, failed to offer into evidence Jourdan's prior exculpatory statements. In our earlier opinion, we unanimously held that the prosecutor did not engage in witness intimidation. A majority of the panel also held that Davis was denied a fair trial and the right to present a defense when the court allowed Jourdan to assert a blanket invocation of his right not to incriminate himself. We ruled in the alternative that, if such an invocation of the Fifth Amendment were permissible, Davis received ineffective assistance of counsel when defense counsel did not seek to introduce Jourdan's prior exculpatory statements. After reconsidering our prior decision, we vacate that prior decision and affirm the district court's denial of Davis's petition in all respects because the state courts did not act contrary to or unreasonably apply clearly established federal law, as determined by the Supreme Court.

### I.

We repeat in this section the facts of the case as recounted in our earlier opinion:

Sheila Jones and her two children, seven-year-old Darquelle Ray and four-year-old Shawanna Ray, were murdered on September 26, 1996. Jones was killed in the home of Davis's father, Jimmy Motley, while the children were killed in their own home, down the street from Motley's. Motley, the boyfriend of Jones, was in jail at the time of the murders. Davis, Bell, and others were in Motley's home on the evening of September 26, when Motley called to speak with Jones, as he frequently did. Davis went down the street to Jones's home and brought her back to Motley's house, where she was killed later that evening. The children were killed soon thereafter.

Davis and Bell were tried in a joint trial before separate juries. The prosecution's theory of the case was that Davis and Bell cooperated in beating and killing Jones and her children. Davis's theory of the case was that Bell killed Jones and the children by himself and that Davis assisted only in disposing of Jones's body, which Davis admitted doing out of fear of retribution from Bell and his family if he refused. Bell confessed to the murders, but also attempted to incriminate Davis, while Davis maintains his innocence. Most of the witnesses implicating Davis were related to or affiliated with Bell. The record reflects no physical evidence linking Davis to the murders. In Davis's testimony at the trial, he claimed the only person (other than himself and Bell) in the house when Jones was being beaten was then fifteen-year-old Damaris Jourdan.[1]

Jourdan's pre-trial statements strongly tend to exonerate Davis of the murder. He made two statements to police approximately one week after the murders, on October 2, 1996, and October

---

[1]This name is sometimes spelled "Jordan" in the record.

3, 1996.  Both Jourdan's mother and father were present for the first statement, which was not Mirandized.  In that statement, Jourdan reported witnessing Bell, and Bell alone, beating, "stomping," and grabbing Jones by the neck, both inside the house and in the front yard and finally dragging her from the yard into the garage.  Jourdan then reported leaving the area.

The day after his first statement, the police brought Jourdan and his mother back to the station for another interview.  This time, the police read him his rights "per the Miranda Warning Card, which he stated he waived."  His mother was also informed of his rights.  The police then informed Jourdan that another suspect had implicated him in the crime.  After waiving his right to remain silent and to have an attorney present, Jourdan denied any involvement in the murders.  He reiterated his statement from the previous day and elaborated somewhat, stating that, just before leaving, he heard Jones breathing in the garage and saw Bell standing nearby holding a black and yellow handled screwdriver.  Jourdan reportedly said to Bell, "Leave her alone," to which Bell responded, "She saw my face."

Approximately ten months later, Jourdan gave a statement to a private investigator hired by Davis's defense counsel.  This statement, while more detailed, is very consistent with the earlier ones given to police.[2]  In addition to the details recited earlier, Jourdan reported that Bell told him that he planned on killing Jones's children (who were still in their home down the street) because they knew where their mother had gone.  Bell reportedly attempted to get Jourdan's help in killing the children.  Jourdan reported that he refused to help and walked off alone before Jones was killed.  He repeatedly told the investigator that neither he nor Davis had hit or stabbed Jones at any time and that Davis was not even outside to witness the violence.  His eyewitness account is consistent with Davis's testimony at trial.  Jourdan's account exonerates himself and strongly tends to exonerate Davis of murder.

Apparently unaware that either the prosecutor or the trial judge would prompt Jourdan to assert his Fifth Amendment privilege, Davis's defense counsel, Phillip Beauvais, identified Jourdan by name in his opening statement and told the jury to expect to hear him recount the version of events described above.  During the trial, after Jourdan was called by the defense and sworn in as a witness, Prosecutor Arthur Busch requested a sidebar.  The judge excused the jury and discussed the prosecutor's concerns on the record.  Busch informed the court, within earshot of Jourdan, that Jourdan was a suspect in the case and should be informed of his Fifth Amendment rights before he testified.  After questioning Jourdan briefly, the judge obtained counsel for him, who spoke with Jourdan and his parents and reviewed relevant documents.  On advice of counsel appointed by the judge, Jourdan invoked his Fifth Amendment privilege against self-incrimination and refused to testify.  The trial court did not follow the normal procedure of putting the witness on the stand and allowing him to invoke the privilege as to individual questions.  Instead, the court allowed Jourdan not to testify or answer any questions at all, stating "whether or not he testifies is a choice that is his alone under these circumstances."  This sparked a heated exchange between Davis's defense counsel and the prosecutor:

> BEAUVAIS:  I think what is happening today is that this young man is afraid that if he takes the stand and testifies truthfully and that truthful testimony will help Danta Davis that, in fact, the Prosecutor will then, as retribution for him testifying, will then charge him with a crime.  I believe the only reason that this was brought forward at this particular time was to keep this young man from testifying.  And I believe that because of that my client is being denied his right to a fair trial and is

---

[2]The record of Jourdan's statement to the private investigator is in question-and-answer format, similar to a trial transcript, while the statements to the police are summaries, apparently written by an officer present at the interviews.

denied his right to have his witnesses appear, witnesses that can certainly exonerate this person.

. . . .

BUSCH: This is not an intimidating thing, that is to try and protect the People's right, as well as Mr. Jourdan's right. Quite frankly, if we had our druthers, we would prefer him to testify in this matter because we think it would bring out the truth. But there is no—there is no merit to any allegation that our office somehow is involved in some intimidation of Mr. Jourdan. We have made it clear throughout, since this trial started, to defense counsel that at some point if [Jourdan] was to be summoned that he would need to have counsel and that there should be some discussion of that with this particular individual.

The trial continued without Jourdan's testimony, and both Davis and Bell were convicted and received multiple life sentences. No charges have been brought against Jourdan for the murders.

Davis made a motion for a new trial based, in part, on his objections to the handling of Jourdan's testimony by the prosecutor and trial judge. This resulted in an evidentiary hearing where both defense counsel Beauvais and prosecutor Busch testified regarding their discussions and actions about Jourdan leading up to the trial.

It is undisputed that the prosecutor never charged Jourdan with any participation in the crime. Busch testified that police had notified him that some evidence existed implicating Jourdan in the crime, primarily the testimony of Bell that Jourdan had also stabbed Jones. At the time of Davis's trial, however, Busch did not believe the case was strong enough to pursue charges against Jourdan, although he did allegedly make some additional efforts to develop the evidence after Davis's trial concluded. Busch testified that prior to Jourdan's appearance in court, he had several conversations with Beauvais, at least once in chambers with the trial judge, wherein he raised his Fifth Amendment concerns and notified Beauvais of the need for Jourdan to have separate representation. Before issuing his order regarding the motion for a new trial, the judge reported that he remembered discussions in chambers about Jourdan before he was called, but he could not remember the precise issues raised.

Beauvais repudiated Busch's account and claimed that the only conversations that they had regarding Jourdan pertained to possible hearsay objections to his testimony. Furthermore, Beauvais testified that he would not have mentioned Jourdan by name in his opening statement, nor would he have called him to the stand in front of the jury, if the prosecutor or the court had made him aware of potential Fifth Amendment concerns. Jourdan's name appeared on both the defense and the prosecution's witness lists, which were exchanged long before trial. Beauvais, therefore, gave notice to the prosecutor of Jourdan's upcoming appearance and provided ample time for him to notify defense counsel of his concerns prior to opening statements.

The court denied Davis's motion for a new trial finding that defense counsel "knew or should have known—with emphasis on the should have known—that Mr. Jordan [sic] required some treatment outside the presence of the jury before he was called to the stand." It rejected his claim that the prosecutor had acted improperly or in an intimidating fashion by alerting the court of his constitutional concerns.

Davis then appealed to the Michigan Court of Appeals, which held that the trial judge had misstated the law in determining that the witness, not the court, could decide for himself if the privilege applied. Nevertheless, the Court of Appeals affirmed the lower court's decision because "the trial court also found that there was a reasonable basis for Jordan [sic] to fear self-incrimination

. . . ." *People v. Davis*, No. 207725, 2000 WL 33385391, at *3 (Mich. Ct. App. Dec. 26, 2000) (per curiam).

Davis properly and timely exhausted his claims in state court and then filed this petition for a writ of habeas corpus in federal district court. A magistrate judge issued a report and recommendation denying his petition, which was adopted by the district court. In the report, the Magistrate Judge determined that Jourdan's blanket assertion of the privilege did not provide grounds to grant the writ because "[e]ven his admission that he was present during the murder, although undisputed and not sufficient in itself to convict him of any crime, would be one link in the chain of evidence establishing his guilt." Davis appeals the judgment of the district court.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), permits federal courts to grant petitions for habeas corpus only when a state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." The Supreme Court has said that a decision is contrary to clearly established precedent "if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Holdings of the Supreme Court, not dicta, clearly establish federal law. *Id.* at 412. Ultimately, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

This court reviews the legal conclusions of the district court de novo and its factual findings for clear error. *See Lott v. Coyle*, 261 F.3d 594, 606 (6th Cir. 2001). We review de novo the mixed factual and legal issue of whether Davis received ineffective assistance of counsel. *See id.* After reconsidering our earlier decision, we hold that the state courts did not act contrary to or unreasonably apply precedent of the Supreme Court.

## III.

We reaffirm our earlier holding that the prosecutor in this case did not engage in any unconstitutional intimidation of Jourdan by ensuring that Jourdan was aware of his right not to incriminate himself. In *Webb v. Texas*, 409 U.S. 95, 98 (1972), the Supreme Court established a standard for finding a constitutional violation for witness intimidation: "the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." The following year, we applied *Webb* to a case where the prosecutor sent a Secret Service agent to communicate ex parte with a potential witness and threaten prosecution if he testified. "[T]he Government's action here substantially interfered with any free and unhampered determination the witness might have made as to whether to testify and if so as to the content of such testimony." *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973). The prosecutor's conduct in the instant case simply does not rise to the level of intimidation present in *Webb* and *Thomas*. Here, the prosecutor requested a sidebar with the judge, wherein he informed the court that the witness was a suspect and should be informed of his constitutional rights. The judge then proceeded to question the witness briefly and appointed independent counsel to advise him of his rights. Neither the prosecutor's nor the judge's conduct was unconstitutional, especially considering the ethical obligation, imposed on prosecutors by the ABA's model guidelines, to

> advise a witness who is to be interviewed of his or her rights against
> self-incrimination and the right to counsel whenever the law so requires. It is also

proper for a prosecutor to so advise a witness whenever the prosecutor knows or has reason to believe that the witness may be the subject of a criminal prosecution.

ABA Standards for the Administration of Criminal Justice § 3-3.2(b).

Regardless of the prosecutor's motives or the propriety of waiting until the witness was called to the stand to inform the court of his concerns, we cannot say that the Michigan Court of Appeals unreasonably applied Supreme Court precedent in its holding that the prosecutor did not intimidate Jourdan into invoking the privilege.

**IV.**

Because the Supreme Court has never held that permitting a witness to assert his or her Fifth Amendment privilege against self-incrimination without taking the witness stand violates a defendant's right to a fair trial, the trial court did not act contrary to clearly established federal law when it allowed Jourdan to invoke the privilege before taking the witness stand. To support his claim that the state courts' handling of Jourdan's Fifth Amendment privilege against self-incrimination was contrary to clearly established federal law, Davis refers us to two Supreme Court cases: *Hoffman v. United States*, 341 U.S. 479 (1951), and *Washington v. Texas*, 388 U.S. 14 (1967).[3] Davis argues that *Hoffman* clearly established that witnesses must invoke their Fifth Amendment privilege in response to each posed question and that *Washington* required the trial court to compel Jourdan to testify because, otherwise, Davis would have been arbitrarily deprived of his right to a fair trial. Our review of these cases, however, convinces us that *Hoffman* and *Washington* did not clearly establish how to resolve the conflict between a witness's Fifth Amendment privilege and a defendant's right to present his defense. Because these cases do not resolve the issue, the state courts necessarily could not have acted contrary to clearly established Supreme Court precedent.

The witness Jourdan invoked his Fifth Amendment right not to testify, after consulting with independent counsel, without unconstitutional intimidation by the prosecution. The trial court did not require Jourdan to take the stand and invoke his right in response to each question. The only way to hold that this procedure was "contrary to" established Supreme Court law is to determine that Supreme Court case law requires defense witnesses invoking the Fifth Amendment right against self-incrimination to take the stand and invoke the right on a question-by-question basis.

Such a rule doubtless has merit, *see In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983), although it could be argued that the trial court should have discretion to permit blanket invocation of the right in appropriate circumstances.[4] But the petitioner has referred to no Supreme Court case holding that such a procedure is required for the benefit of criminal defendants.

*Hoffman v. United States*, 341 U.S. 479, 486-87 (1951), did not hold that a witness's privilege against self-incrimination must yield in favor of the defendant's right to put on his defense, because the Court did not consider a witness's invocation of the privilege. In *Hoffman*, the defendant, not his witness, claimed the privilege during a grand jury hearing. The Court,

---

[3]Davis also refers us to several circuit court cases, including cases from this circuit. However, AEDPA permits us to consider only federal law, "as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1).

[4]Defendant suggests that the first question for Jourdan would have been: "Were you present?" A strong case can be made that such an initial question could properly warrant invocation of the privilege. *See Hoffman v. United States*, 341 U.S. 479 (1951). If so, it is arguably a pointless formality, within a trial court's discretion to forgo, to insist that the witness take the stand.

accordingly, did not consider the relationship between the witness's privilege against self-incrimination and the defendant's right to put on his defense.

*Hoffman*, moreover, announced no rule proscribing the blanket assertion of the privilege against self-incrimination. In fact, the Court *upheld* the defendant's invocation of the privilege as to very preliminary questions. The opinion in *Hoffman* does state at one point, "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. at 486-87. This single sentence by its terms, and certainly in context, does not necessarily imply—and clearly does not hold—that defense witnesses must always take the stand to invoke the privilege. *See Arredondo v. Ortiz*, 365 F.3d 778, 782 (9th Cir. 2004) (holding, in a case extremely similar to the one at bar, that *Hoffman* does not mandate question-by-question invocation of the privilege). In context, the Court may have been simply admonishing trial courts to use their good judgment when determining whether a responsive answer would tend to incriminate the witness. *Hoffman*, 341 U.S. at 486. Indeed, the Court immediately followed by saying: "The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" *Id.* at 487 (citing *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D. Ohio 1896) (Taft, J.)).[5]

It is true that our circuit in *Morganroth*, *supra*, stated as follows:

A blanket assertion of the privilege by a witness is not sufficient to meet the reasonable cause requirement and the privilege cannot be claimed in advance of the questions. The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety of the refusal to testify. *See Hoffman*, 341 U.S. at 486-88.

718 F.2d at 167. The issue resolved in *Morganroth*, however, was not whether the invocation of the privilege required that the witness take the stand. The witness in that case had in fact taken the stand. Instead, the issue was whether the witness "must supply personal statements . . . or . . . evidence with respect to each question propounded to him to indicate the nature of the criminal charge which provides the basis for his fear of prosecution" in the particular context of possible incrimination for perjury. *Id.* at 169. Such a requirement was warranted where the witness feared incriminating himself of perjury by giving testimony inconsistent with prior sworn testimony, because "the incriminating nature of the answer is not evident from the implications of the question in the setting in which it is asked . . . ." *Id.*

Not only is this a different issue, but also the issue was raised in the context of an appeal by a witness from an order directing him to testify, not in the context of a criminal defendant's right

---

[5] To bolster his reading of *Hoffman*, Davis argues that *Mitchell v. United States* compels a question-by-question invocation because the Court stated "that where there can be no further incrimination, there is no basis for the assertion of the privilege." 526 U.S. 314, 326 (1999). But this dictum in *Mitchell* does not assist Davis. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (stating that "clearly established" refers to holdings, not dicta). First, the *Mitchell* Court considered two issues not before us in this case: whether a defendant's guilty plea waives his privilege against self-incrimination in the sentencing phase of a trial, and whether a sentencing judge can draw an adverse inference from the defendant's silence. The Court did not consider the Fifth Amendment right of a witness in relation to the defendant's right to present his defense. Second, the Court's dictum does not call into question the trial court's determination that Jourdan was in danger of further incrimination on cross-examination. In fact, the Court stated that the defendant "may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details [upon cross-examination]." *Id.* at 321. *Mitchell* not only dealt with different issues but also supports the trial court's inquiry into whether Jourdan could further incriminate himself. *Mitchell*, therefore, does not support Davis' argument that *Hoffman* clearly established that Davis was entitled to have Jourdan take the witness stand.

to present testimony. The statement in *Morganroth* about blanket assertions and particular questions is thus at best dictum with respect to the issue presented in this case: whether a criminal defendant has a due process right to prevent witnesses from invoking the Fifth Amendment without taking the stand and responding to individual questions, regardless of the circumstances. In any event, AEDPA calls for us to interpret clearly established federal law, "as determined by the Supreme Court of the United States," not the United States Courts of Appeals. Indeed, the Supreme Court has considered that a state court may disagree with the law of its federal circuit: "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The Supreme Court's decision in *Washington v. Texas*, 388 U.S. 14 (1967), also fails to warrant a grant of habeas corpus under AEDPA. It is true that, entirely outside the Fifth Amendment self-incrimination context, *Washington v. Texas* clearly established that, under the Sixth Amendment, a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense. *Washington*, 388 U.S. at 23. But the Michigan Court of Appeals' decision was neither contrary to nor an unreasonable application of *Washington v. Texas*.

*Washington v. Texas* does not hold that a defendant has the right to present any and all witnesses. The Court addressed the limits of a defendant's right to call witnesses and held that a state cannot create "arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief." *Id.* at 22. The Court proceeded to hold that Texas' rule against allowing purported accomplice testimony was an "absurdity." *Id.* Because the Court did not consider the question of a witness's Fifth Amendment privilege against self-incrimination anywhere in its opinion, it cannot be said that the Court created clearly established law against a blanket assertion of the privilege or resolved how courts should treat the tension between the witness's and the defendant's interests. *See id.* at 23 n.21 ("Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination . . . , which [is] based on entirely different considerations from those underlying the common-law disqualifications for interest.").

## V.

The remaining basis for granting the writ—that Davis received ineffective assistance of counsel when defense counsel did not try to introduce Jourdan's prior unsworn statements into evidence—fails because Davis was not prejudiced by his counsel's failure to seek the admission of Jourdan's prior statements. Constitutionally ineffective assistance of counsel requires both that defense counsel's services fell below that of a reasonably competent attorney and that the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, Davis must demonstrate that Jourdan's prior unsworn statements were admissible. But the contrary was held by the Michigan Court of Appeals, which determined as a matter of state evidence law that Jourdan's prior statements would not have been admissible in any event. *See People v. Davis*, No. 207725, 2000 WL 33385391, at *3 (Mich. Ct. App. Dec. 26, 2000) (per curiam) ("[The statements] do not qualify as statements against his penal interest for purposes of MRE 804(b)(3)."). We are bound by the state court's determination of its own law. *Hutchison v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984); *see also Vroman v. Brigano*, 346 F.3d 598, 603 (6th Cir. 2003); *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir. 2001); *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986). Because we cannot logically grant the writ based on ineffective assistance of counsel without determining that the state court erred in its interpretation of its own law, we are constrained to uphold the district court's denial of the writ.

Finally, a different result is not required by the asserted tension between a constitutional holding that a witness may not be required to testify for fear of providing an incriminating statement and a state-law evidentiary holding that prior statements by the same witness were not admissible

as statements against penal interest.  Davis does not refer us to any authority for the proposition that these determinations are legal mirror-images of each other, and certainly the Supreme Court has not so held as a matter of constitutional law.  The state courts, therefore, did not act contrary to or unreasonably apply federal law when determining that Davis received effective assistance of counsel.

## VI.

Upon reconsideration, we VACATE our prior order and AFFIRM the judgment of the district court.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting. The majority's decision achieves the unfortunate trifecta of misapplying the Supreme Court's jurisprudence under 28 U.S.C. § 2254(d)(1), gutting the Article III judicial power while "suspending" the writ of habeas corpus, and stranding a probably innocent inmate in prison for life. This Court does so by construing § 2254(d)(1) and its "clearly established law" requirement to preclude federal habeas relief except where Supreme Court precedent with indistinguishable facts counsels otherwise. There seems little doubt that prior to the enactment of § 2254(d)(1) of AEDPA, and my colleagues' interpretation of it, the writ of habeas corpus would have issued in this case to require a new trial in which Davis would be allowed to put before the jury Jourdan's exculpatory testimony.

## I. The Requirements of 28 U.S.C. § 2254(d)(1)

Notwithstanding the majority's contention to the contrary, the Supreme Court had set forth "clearly established law" both under the Sixth Amendment Compulsory Clause and the Fifth Amendment's self-incrimination privilege prior to the Michigan Court of Appeals' decision, from which the Michigan Supreme Court denied leave to appeal. The Michigan Court's brief *per curiam* opinion was contrary to that clearly established law because it failed to mention or apply the relevant governing legal principles under the Fifth and Sixth Amendments. Thus, our Court should have issued the writ in this case to correct the conviction's constitutional infirmity.

### A. "Clearly Established Law"

28 U.S.C. § 2254(d)(1) empowers an Article III court to grant the writ of habeas corpus where a state court judgment "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The Supreme Court has defined "clearly established law" as the holdings, not dicta, of its decisions. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The term "holding" for purposes of § 2254(d)(1) is not limited to bright-line rules and narrow statements like "judgment for defendant" but instead refers to "the governing legal principle or principles set forth by the Supreme Court." *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

The Supreme Court has adopted the spectrum of abstraction of *Teague v. Lane*, 489 U.S. 288 (1989), to determine whether a particular legal principle was clearly established at the relevant time. *See Williams*, 529 U.S. at 412 (With the caveat that the source of clearly established law is Supreme Court jurisprudence, "whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1)."). At one end of the spectrum lie legal principles with such a high level of generality, like the Eight Amendment principle of reliability in sentencing, whose application does not necessarily lead to a "predictable development" in the relevant law and therefore can not be considered clearly established. *See Sawyer v. Smith*, 497 U.S. 227, 236 (1990). On the other end are narrowly drawn bright-line rules with little application beyond factually indistinguishable situations. In the middle of the spectrum lie those general principles of law crafted by the Supreme Court to constitute clearly established law in a wide range of factual situations. It was the middle of the spectrum that Justice Kennedy described while concurring in *Wright v. West*, 505 U.S. 277, 308-09 (1992):

> If the rule in question is one which of necessity requires a case-by-case examination
> of the evidence, then we can tolerate a number of specific applications without

saying that those applications themselves create a new rule . . . Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.

A majority of the Supreme Court has adopted Justice Kennedy's "case-by-case" view. *See Williams*, 529 U.S. at 391 ("That the *Strickland* test 'of necessity requires a case-by-case examination of the evidence' obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court.") (internal citation omitted); *Rompilla v. Beard*, __ U.S. __, 125 S. Ct. 2456, 2471 (2005) (O'Connor, J., concurring) (noting the " 'case-by-case examination of the evidence' called for under our cases"); *Williams*, 529 U.S. at 382 (Stevens, J., dissenting in part) ("In the context of this case, we also note that, as our precedent interpreting *Teague* has demonstrated, rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule."); *Graham v. Collins*, 506 U.S. 461, 506 (1993) (Souter, J., dissenting) ("One general rule that has emerged under *Teague* is that application of existing precedent in a new factual setting will not amount to announcing a new rule.").

Broad rules whose application to new factual situations have constituted clearly established law include *Strickland*'s ineffective assistance of counsel standard, *see Williams*, 529 U.S. at 391; *Rompilla*, 125 S. Ct. at 2460, and *Jackson v. Virginia*'s sufficiency of the evidence standard, *see Wright*, 505 U.S. at 308-09 (Kennedy, J., concurring). The Courts of Appeals have followed suit by finding clearly established law even where Supreme Court case law does not rest "on all fours." *Lewis v. Johnson*, 359 F.3d 646, 655 (3d Cir. 2004); *Hart v. Attorney Gen. of the State of Florida*, 323 F.3d 884, 893 n.16 (11th Cir. 2003); *Burdine v. Johnson*, 262 F.3d 336, 354 (5th Cir. 2001); *Torres v. Prunty*, 223 F.3d 1103, 1110 (9th Cir. 2000).

In the instant case, my colleagues have identified, but incorrectly applied, the overriding legal principle applicable to this case in part V of their opinion:

> *Washington v. Texas* clearly established that, under the Sixth Amendment, a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense. *Washington*, 388 U.S. at 19.

This principle of general application has been clearly established since 1967, decades before the state judgment at issue here. This principle interprets the Sixth Amendment's Compulsory Process Clause (the right of "the accused . . . to have compulsory process for obtaining witnesses in his favor"), which, as described by Blackstone, catechized in the Bill of Rights this well-established and fundamental right of English law. *See* Peter Westen, *The Compulsory Process Clause*, 73 Mich. L. Rev. 71, 90-101 (1974). The *Washington v. Texas* principle, though perhaps narrower than *Strickland*, fits comfortably within the middle of *Teague*'s spectrum of abstraction in that the principle both provides sufficient content for predictable legal development and applies to a varied range of factual situations. Moreover, the principle clearly applies here because the testimony of the witness Jourdan is "relevant and material," and if believed by the jury — which seems likely to me — would have entirely exonerated Davis of the murder for which he is now imprisoned for life.

A second clearly established legal principle applicable to this case is that a witness like Jourdan may not invoke the self-incrimination privilege unless the danger is "real and probable," not "imaginary and unsubstantial," *Brown v. Walker*, 161 U.S. 591, 608 (1896); *see also Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (describing the Supreme Court's pre-2000 Fifth Amendment precedent). And "where there can be no further incrimination, there is no basis for the assertion of the privilege," *Mitchell v. United States*, 526 U.S. 314, 326 (1999). A witness cannot establish that

the danger is "real and probable" by a blanket assertion because "[t]he witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself — his say-so does not of itself establish the hazard of incrimination." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Rather, the witness should take the stand and give "a responsive answer to the question or an explanation of why it cannot be answered" without self-incrimination. *Id.* at 487.

Once again, these Fifth Amendment principles fall well within the Supreme Court's "case-by-case" approach to its clearly established law jurisprudence and are clearly applicable to the instant case. Jourdan had given three statements before he was called as a witness. He gave two of his statements to the police, each of which was given almost a year before trial, and one to a private investigator. It was clear from his statements that he had nothing to do with the murder and neither did Davis whose behavior Jourdan observed. Jourdan was not threatened with prosecution, and, even if he were to be criminally prosecuted for these murders, his post-*Miranda* statement to the police, which included an admission that he was present during the beating of Jones, would clearly be admissible against him, just as properly *Mirandized* confessions are admissible in subsequent prosecutions against the defendants who made them. *See Miranda v. Arizona*, 384 U.S. 436, 476-77 (1966). As the Supreme Court foresaw in *Walker* and *Mitchell*, there reaches a point where a piece of evidence – in this case Jourdan's presence at the scene of the crime – which all parties agree is only incriminating in the most minimal and remote way, is so overwhelmingly and definitively established that it cannot be constitutionally used to stonewall introduction of other evidence that is highly exculpatory of a criminal defendant. The Fifth Amendment may not be so prompted and used as a shield for the flaw in the state's case, used in such a mechanistic way that it subsumes a criminal defendant's Sixth Amendment right to present a defense.

The majority cites the following quotation from *Washington v. Texas* for the proposition that its legal principle is inapplicable to this case: "Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination . . . , which [is] based on entirely different considerations from those underlying the common-law disqualifications for interest." *Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967). A holding that a witness should be compelled to testify where there is no real and probable danger of incrimination and where there can be no further incrimination does not "disapprove" the privilege against self-incrimination. I do not argue that the Sixth Amendment's Compulsory Clause trumps the Fifth Amendment's self-incrimination privilege, but only that where the two meet and the self-incrimination privilege is hardly, if at all, implicated, the accused should be able to compel exculpatory testimony.

In direct contrast to the Supreme Court's "case-by-case" interpretation of clearly established law, the majority's narrow approach in the instant case finds no clearly established law "[b]ecause the Supreme Court has never held that permitting a witness to assert his or her Fifth Amendment privilege against self-incrimination without taking the witness stand violates a defendant's right to a fair trial . . . ." This approach apparently looks first at the facts of the case, extracts the narrowest possible legal rule to fit that situation, and then, upon predictably finding no Supreme Court precedent resting on all fours, uncovers no clearly established law. This novel jurisprudence marks an abrupt departure from traditional notions of *stare decisis* and violates the dictates of *Teague* and its progeny.

### B. "Contrary to" and "Unreasonable Application"

The Michigan Court of Appeals' brief *per curiam* opinion was contrary to the above-discussed clearly established law. A state court decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An example of the

former situation occurs where a court applies the preponderance of the evidence standard when Supreme Court precedent dictates application of the reasonable probability standard. *Id.* at 406.

The state court's decision in the instant case neither identified nor applied the governing legal principle of *Washington v. Texas* that a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense. With such an oversight, it is not difficult to conclude that the state court's determination that "the trial court did not err in refusing to compel Jordan to testify" was contrary to the clearly established mandate of *Washington v. Texas*.

Neither did the state court's decision identify or apply the Fifth Amendment principles that a witness may not invoke the self-incrimination privilege where there is not a "real and probable" danger of incrimination or "where there can be no further incrimination." Although the state court did discuss the self-incrimination privilege with respect to Jourdan, it observed that "the trial court also found that there was a reasonable basis for Jourdan to fear self-incrimination" without any analysis of the above-discussed clearly established Fifth Amendment principles relevant to this case. Because, as discussed above, Jourdan's fear of self-incrimination was not "real and probable" and there was no danger of "further incrimination" due to his three previous statements, the state court's decision was contrary to clearly established Supreme Court precedent.

The state court's discussion of the relevance of the self-incrimination privilege to Jourdan, however, raises the possibility that this Court should review the Fifth Amendment issue under the "unreasonable application" prong of § 2254(d)(1). A state court unreasonably applies clearly established Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. To the extent that the state court could be deemed to have identified the correct legal principle by merely discussing the self-incrimination privilege, the state court's decision unreasonably applied the above-discussed Fifth Amendment principles because, as demonstrated above, Jourdan's fear of self-incrimination was simply not "real and probable" and there was no danger of "further incrimination." Likewise, the state court did not extend these relevant and clearly established Fifth Amendment principles to the facts of this case and, therefore, engaged in an unreasonable application of clearly established Supreme Court precedent.

A final observation on the reasonableness of the state court's decision is warranted in light of the Supreme Court's statement that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 124 S. Ct. 2140, 2149 (2004). The legal principles involved here, although principles of general application, lie much closer to the middle than the end of *Teague*'s spectrum of abstraction where broad principles offer little guidance to applying courts. The principles of general application relevant in this case appropriately cabin state court discretion and provide little leeway for the state court's manifestly erroneous refusal to compel Jourdan to testify.

## II. Constitutional Concerns

It seems to me that the Court's reading of AEDPA both unconstitutionally refuses to exercise the "judicial power" required under Article III in a case "arising under this constitution" and "suspends" the writ of habeas corpus in violation of Article I, Section 9. The result — life imprisonment for a probably innocent accused — so undermines both the "the judicial power"and the great writ that it leaves the federal courts without the authority to correct constitutional errors that lead to serious injustice.

## A. The "Judicial Power" to Interpret the Constitution

The majority's narrow view of § 2254(d)(1) unconstitutionally obstructs Article III's mandate to exercise the judicial power in cases over which the court properly has jurisdiction. The notion that AEDPA's § 2254(d)(1) raises grave constitutional concerns by impinging on the judicial power and "suspending" the writ of habeas corpus is far from new. *See, e.g.*, *Irons v. Carey*, 408 F.3d 1165 (9th Cir. 2005) (ordering parties to file briefs on the constitutionality of § 2254(d)(1)); *Lindh v. Murphy*, 96 F.3d 856, 885 (7th Cir. 1996), *rev'd* 521 U.S. 320 (1997) (Ripple, J., dissenting) (concluding that § 2254(d)(1) violates Article III); Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* §§ 32.4, 7.2(d) (4th ed. 2001) (discussing constitutionality of § 2254(d)(1)); Brief of Amicus Curiae Marvin E. Frankel et al., *Williams v. Taylor*, 529 U.S. 362 (2000) (No. 98-8384) (brief of five former Article III judges arguing that § 2254(d)(1) violates Article III); Brief of Amicus Curiae ABA, *Williams v. Taylor*, 529 U.S. 362 (2000) (No. 98-8384) (arguing that a court of appeals' interpretation of § 2254(d)(1) violates Article III). The majority's approach exacerbates these concerns and recasts the judicial power as only a faint shadow of Chief Justice Marshall's vision that "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

The following provisions of the Constitution describe the judicial power:

Article III, Section 1. "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish . . . Section 2. *The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . .* — to all Cases affecting Ambassadors, other public Ministers and Consuls . . . . In all Cases affecting Ambassadors, other public Ministers and Consuls . . . the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."

Article VI. This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. (Emphasis added.)

The *Federalist Papers No. 78* by Hamilton explains the "judicial power" in the following way:

Whoever attentively considers the different departments of power must perceive, that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution . . . . The judiciary . . . has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society . . . .

The complete independence of the courts of justice is peculiarly essential in a limited Constitution. By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority . . . . Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing . . . .

It is far more rational to suppose, that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep

the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be regarded by the judges, as a fundamental law.

In interpreting the judicial power, the Supreme Court has jealously guarded against undue encroachment, especially from Congress and state courts. Once providing jurisdiction, Congress may not "prescribe rules of decision" that prohibit an Article III court from giving "the effect to evidence which, in its own judgment, such evidence should have" or that leave "the court no adjudicatory function to perform." *United States v. Klein*, 80 U.S. 128, 146-47 (1871); *United States v. Sioux Nation of Indians*, 448 U.S. 371, 392 (1980); *see also Yakus v. United States*, 321 U.S. 414, 468 (1944) (Rutledge, J., dissenting). This Court has jurisdiction under 28 U.S.C. § 2254(a) to decide the constitutional issues in this case. Congress may not say to the federal courts "clearly established law" means a case in the Supreme Court directly in point on the facts, just exactly like the case you have before you. It may, however, say, as the Supreme Court has already said in *Teague v. Lane*, 489 U.S. 288 (1989), and its progeny, you should follow constitutional language and the principles and standards established by the Supreme Court and in existence at the time the state court completed its case. In the present case, my colleagues have said rather, there is no case in the Supreme Court just like the present case — no case directly in point on the facts — and hence the habeas petition must be dismissed. They say that Supreme Court precedent must be defined in its narrowest sense. Such a reading of § 2254(d)(1) renders it unconstitutional by preventing our Court from giving our independent judgment on the legal effect of the evidence before us and by leaving us "no adjudicatory function to perform."

Likewise, Congress cannot require Article III courts to defer to state courts' reading of federal law by preventing the federal judiciary from independently interpreting and applying federal law. *See Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (describing "the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution" as "a permanent and indispensable feature of our constitutional system"). Justice Stevens has cautioned against interpretations of § 2254(d)(1) that provide undue deference to state court judgments:

> At the core of [the judicial] power is the federal courts' independent responsibility--independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States--to interpret federal law. A construction of AEDPA that would require the federal courts to cede this authority to the courts of the States would be inconsistent with the practice that federal judges have traditionally followed in discharging their duties under Article III of the Constitution.

*Williams*, 529 U.S. at 378-79 (Stevens, J., dissenting in part). Using § 2254(d)(1) as a crutch, the majority simply defers to the state court's decision in which the state court neither identifies nor applies the relevant governing legal principles under either the Compulsory Process Clause or the Self-Incrimination Clause. The majority defers by concluding that there is no Supreme Court case with indistinguishable facts. As explained above, this is not the correct interpretation of § 2254(d)(1). Such an interpretation would withdraw from the federal courts, including the Supreme Court, the judicial power to interpret independently the Constitution in most cases and would make the state court's decision the rule we must follow. Such an application of the federal judicial power established in Article III would render § 2254(d)(1) unconstitutional, as Justice Stevens suggests and *Klein* holds.

## B.  Suspension of the Writ

In the *Federalist Papers No. 84* by Hamilton, we find the following statement of the Founders' original intent:  "The most considerable of the remaining objections [to the 1787 Constitution] is that the plan of the convention contains no bill of rights."  Hamilton then gives an answer to these objections.  He says that the structure of the government itself providing only for enumerated powers and for checks and balances is one of the answers to these objections.  Beyond that, he answers the objections as follows:

> Independent of those [answers] which relate to the structure of the government, we find the following: . . . . Section 9 [Article I] clause 2 — "The privilege of the writ of *habeas corpus* shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it . . . ."  [T]he practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instrument of tyranny.  The observations of the judicious Blackstone, in reference to the latter, are well worthy of recital: . . . "confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and, therefore *a more dangerous engine* of arbitrary government."  And as a remedy for this fatal evil he [Blackstone] is everywhere peculiarly emphatical in his encomiums on the *habeas-corpus* act, which in one place he calls "the Bulwark of the British Constitution."

The writ of habeas corpus is the only writ named in the Constitution.  So great was its importance for the preservation of liberty that the members of the Constitutional Convention equated it, along with the structural provisions, with a Bill of Rights.  Had not some state ratification conventions insisted on a Bill of Rights, the federal courts would have had to create an unwritten Bill of Rights using the writ of habeas corpus and the doctrine that the elected branches are limited to the enumerate powers named in the Constitution.  Because of the importance of the clause forbidding the suspension of the writ, the Supreme Court has refused to allow Congress, the executive or the lower courts seriously to reduce its coverage and protections.  For example, in *INS v. St. Cyr*, 533 U.S. 289, 300 (2001), the Supreme Court refused to adhere to an interpretation of an immigration statute and AEDPA that "would give rise to substantial constitutional questions" under the Suspension Clause.[1]

A reading of AEDPA § 2254(d)(1) that so broadly circumscribes the writ of habeas corpus that we cannot reach the full merits of the constitutional issue before us violates the Suspension Clause.  We should hold that the Compulsory Process Clause, as interpreted in *Washington v. Texas*, provides the constitutional rule of decision and that its full application here does not conflict with any decision of the Supreme Court interpreting the Self-Incrimination Clause.

For the foregoing reasons, I dissent.

---

[1] See the discussion of the history and meaning of the Constitution's Suspension Clause in the dissenting opinion of Justice Scalia, joined by Justice Stevens, in *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633, 2660-74 (2004), and their admonition that:

> The Suspension Clause of the Constitution, which carefully circumscribes the conditions under which the writ can be withheld, would be a sham if it could be evaded by congressional prescription of requirements *other than the common-law requirement of committal for criminal prosecution* that render the writ, though available, unavailing.

*Id.* at 2672 (emphasis in original).