IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 10, 2012 Session

**STATE OF TENNESSEE v. DEMETRIUS M. CLARK**

**Appeal from the Circuit Court for Madison County**
**No. 09-514     Roy B. Morgan, Jr., Judge**

**No. W2011-00524-CCA-R3-CD  - Filed November 19, 2012**

The Defendant-Appellant, Demetrius M. Clark, was convicted by a Madison County Circuit Court jury of two counts of possession of more than .5 grams of cocaine with the intent to sell and/or deliver, two counts of possession of hydrocodone with the intent to sell and/or deliver, one count of possession of a firearm with the intent to go armed during the commission of a dangerous felony, and one count of possession of drug paraphernalia. The trial court merged the two convictions for cocaine possession and merged the two convictions for hydrocodone possession and sentenced Clark as a Range I, standard offender to concurrent sentences of ten years for the cocaine possession conviction, three years for the hydrocodone possession conviction, and eleven months and twenty-nine days for the drug paraphernalia conviction and to a consecutive sentence of three years at one hundred percent for the firearm conviction, for an effective sentence of thirteen years. On appeal, Clark argues: (1) he was deprived of his due process right to present a defense; (2) the trial court committed plain error in denying his motion to suppress evidence recovered pursuant to a search warrant; and (3) the evidence is insufficient to sustain his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

David W. Camp, Jackson, Tennessee, for the Defendant-Appellant, Demetrius M. Clark.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. (Jerry) Woodall,  District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On March 20, 2009, police officers searched a residence located at 15 Villa Drive in Jackson, Tennessee, pursuant to a search warrant. The search warrant was issued based on an affidavit that contained information from a reliable confidential informant indicating that Clark and a large amount of cocaine could be found inside the residence. Pursuant to this search, the officers recovered 2.6 grams of crack cocaine, six bottles containing liquid hydrocodone, a hydrocodone pill, a loaded Taurus .38 special revolver, and several items of drug paraphernalia. Clark was arrested during the search. He subsequently filed a motion to suppress the evidence recovered during the search.

**Motion to Suppress.** On January 25, 2010, the trial court heard Clark's motion to suppress the evidence seized during the search of the residence at 15 Villa Drive. In support of the motion, the defense presented testimony from Investigator Phillip Kemper and confidential informant Hermit Martin and admitted Investigator Kemper's affidavit, the search warrant for the residence at 15 Villa Drive, and Hermit Martin's affidavit. The State presented testimony from Investigator Richard Newbill.

Investigator Kemper of the Jackson Police Department testified that he presented the affidavit that resulted in the issuance of the search warrant for the residence located at 15 Villa Drive. He acknowledged that the confidential informant who provided the information contained within the affidavit was Terry Hicks. Investigator Kemper admitted that he did not question Hicks about whether Hicks had ulterior motives in providing this information. However, Investigator Kemper asserted that Hicks had provided reliable information to the police in the past.

Investigator Kemper's affidavit stated the following: (1) within the last seventy-two hours, Investigator Kemper was advised by a confidential informant, later identified as Terry Hicks, that Hicks had been to 15 Villa Drive and "had observed a large amount of cocaine . . . for resale" and that Clark resided at the residence with his girlfriend and small child; (2) Hicks had "been reliable in the past in that he . . . had provided information which ha[d] resulted in the recovery of approximately 130 grams of cocaine, over 20 grams of crack cocaine, and 23 pounds of marijuana."; (3) "a records check showed Demetrius Clark ha[d] a 2002 Chevrolet Trail Blazer bearing Tennessee License Plate 729-TGQ registered to 15 Villa Drive"; (4) the utilities for 15 Villa Drive were in Delisa Good's name; (5) Clark's criminal history included a prior arrest for possession of cocaine in Madison County; and (6) Investigator Kemper believed there was probable cause for the issuance of a search warrant for the residence, grounds, outbuildings, and vehicles located at 15 Villa Drive, Jackson, Tennessee.

Investigator Kemper acknowledged that he had reviewed the affidavit submitted by Hermit Martin, another confidential informant for the gang unit, which stated the following:

(1) Martin and Hicks were roommates; (2) Hicks told Martin that Hicks had been charged with the possession and sale of drugs, that he had been working as a confidential informant for police to keep from going to jail, and that he was being pressured by the police to "set up" someone if he wanted to help himself; (3) Martin spent every day with Clark during the two weeks prior to March 18, 2009, the day the affidavit was presented and the search warrant was issued; (4) during the two weeks prior to March 18, 2009, Hicks asked Martin questions about Clark selling drugs, and Martin told Hicks he "didn't know anything about Demetrius Clark selling drugs"; (5) during the two weeks prior to March 18, 2009, Martin never saw Hicks at 15 Villa Drive and never saw Hicks with Clark; (6) on or about March 21, 2009, Hicks asked Martin if he had heard from Clark, and when Martin responded that Clark was not answering his phone calls, Hicks told him that Clark believed that Martin had "set him up," and Martin replied that he had not set up Clark; (7) Hicks bragged about setting up Clark, told Martin that Clark had been having an affair with Hicks's wife, and stated that if Clark was "going to cross [him, he was] going to cross him back out"; (8) Clark and Hicks did "not get along[,]" Hicks did not visit 15 Villa Drive, and Hicks did not "have anything to do with Demetrius Clark"; (9) Hicks knew that Clark often visited at 15 Villa Drive because his girlfriend and child lived there; (10) Martin had been to 15 Villa Drive and was there between March 15, 2009, and March 17, 2009, and never saw "large amounts of cocaine at 15 Villa Drive"; and (11) Martin knew James Simmons, who was a "regular visitor at 15 Villa Drive[.]"

Investigator Kemper stated that he first became aware of the possibility that Hicks had an ulterior motive in providing the information included in his affidavit after reading Martin's affidavit. He said that although the allegations in Martin's affidavit were not corroborated, the information in his own affidavit, which had been submitted to the magistrate, had been corroborated by both Hicks and Martin. Investigator Kemper acknowledged that he was unaware of an affair between Clark and Hicks's wife at the time that he presented the affidavit for the search of the residence at 15 Villa Drive.

Investigator Kemper stated that at the time he signed his affidavit, Hicks had informed him that he had been inside the residence located at 15 Villa Drive and had observed drugs there. Investigator Kemper said that although he contacted Hicks to let him know that his name was being disclosed as a confidential informant in this case, he did not ask Hicks about the truthfulness of Martin's affidavit because he "didn't deem it relevant." Investigator Kemper stated that he received Martin's affidavit "months after" the search warrant was executed and that there was nothing in Martin's affidavit "that affect[ed] the information [he] had before [he] got the search warrant."

Investigator Kemper admitted that Officer David Coffman previously had presented an affidavit for a search warrant in which he identified Clark's address as 41 C Rosewood

Circle. However, Investigator Kemper denied having knowledge of any documentation that would have shown that Clark was not living at 15 Villa Drive immediately prior to the issuance of the search warrant in this case. He asserted that the information in his affidavit showed that Clark had a white Chevrolet Trail Blazer registered in his name at the 15 Villa Drive address. In addition, Investigator Kemper stated that mail was recovered during the search that was addressed to Clark at 15 Villa Drive.

On cross-examination, Investigator Kemper said that Martin provided the police with information corroborating Hicks's information about Clark at the 15 Villa Drive address. However, Investigator Kemper stated that Martin "would not have been considered reliable by the Court" at the time he submitted his affidavit. He stated that Hicks was reliable because his information had led to the recovery of cocaine, crack cocaine, and marijuana in other unrelated cases, a fact that he included in his affidavit. He also stated that the connection between Clark and 15 Villa Drive was corroborated by the fact that Clark's car was registered at that address, that information from Hicks and Martin indicated that Clark's girlfriend, Delisa Good, lived at 15 Villa Drive, and that the utilities at 15 Villa Drive were in Good's name. In addition, he said he was aware that Clark had been arrested for a cocaine charge in Madison County.

Investigator Kemper stated that if he had received Martin's affidavit at the time he made his own affidavit for the search warrant, he still would have considered Hicks to be a reliable informant because Hicks's information had been independently corroborated. He noted that Martin's affidavit had never been corroborated and that Martin had previously given the police "information into Mr. Clark's cocaine trafficking[.]" Investigator Kemper said that the search warrant for Clark at 41 Rosewood Circle was issued before he became involved in this case and that he could not recall whether Clark had been arrested pursuant to Officer Coffman's search warrant.

Hermit Martin testified that he and Terry Hicks were roommates. He said that after the search warrant at 15 Villa Drive was executed, Hicks asked him if he had spoken to Clark, and Martin responded that Clark was not answering his phone. Then Hicks told him that Clark was not going to answer his calls because he believed that Martin had "snitched on him." Hicks said he knew this because Hicks had actually "snitched on him." Martin said that Hicks informed him that he had gotten caught with an eighth of a kilogram of cocaine, and he didn't want to go back to the penitentiary because he had children, so he began working as a confidential informant for the police in exchange for money. When Martin told Hicks that Martin did not need the money that came from working as a confidential informant, Hicks gave him the names of several people he had "snitched on[,]" including Clark. Martin said that Hicks and Clark were not on good terms because Clark had an affair with Hicks's wife some time prior to the issuance of the search warrant at 15 Villa Drive.

Martin said that he and Clark had been close friends since they were teenagers. He also said that Hicks never had been inside the residence at 15 Villa Drive because he and Clark were not friends. Martin said that he visited Clark almost daily at the residence at 15 Villa Drive and had never observed large amounts of cocaine. He also said he often saw James Simmons at 15 Villa Drive and knew that Simmons had admitted that the cocaine recovered at 15 Villa Drive belonged to him.

Martin asserted that he had never been a confidential informant for the Jackson Police Department's gang unit, although he acknowledged that the police had pressured him to be an informant. He explained:

> [Some officers] pulled me over and they found a small amount of cocaine in the car, so they made me after the next day . . . work for them. So I'm on dialysis. I'm a kidney failure patient, so I didn't want to be in jail. So I just told them yeah just to get out, so they let me out the next day, but I never did go get them – I went to their headquarters [be]cause they kept calling me telling me to come see them, come see them. So when I got to the headquarters, they took pictures of me and got my name and gave me a code name or something. They said give them some information. I didn't give them no information. So when I left, they just kept calling me. So they eventually put the warrant on me. They were holding the cocaine [charge] in case – if I worked, they were gonna throw it away I guess, but I never worked for them, so they eventually put the warrant on me.

Martin said that because he was a "no-show," the police issued the warrant for his arrest and deemed him an unreliable informant. Martin said he eventually served three months for his cocaine charge. He added that he never received any favorable treatment, money, or anything else for services he provided to the police department.

Before questioning Martin on cross-examination, the prosecutor reminded Martin that he was under oath and subject to the penalty of perjury. During questioning, Martin again stated that he was not a confidential informant for the gang unit and that he had not worked with Investigator Richard Newbill. Martin admitted telling Investigator Newbill that he knew Clark but denied telling him that Clark was selling cocaine from the residence at 15 Villa Drive and denied telling him that Clark had a half kilogram of cocaine at that residence. He also denied calling Investigator Newbill after the search warrant was executed to ask if he would receive compensation for his tip to the police.

Investigator Richard Newbill of the Jackson Police Department testified that despite Martin's testimony to the contrary, Martin had in fact worked as a confidential informant

with the police department's gang unit. He stated that Martin had given the officers information regarding Clark and the sale of cocaine from the residence at 15 Villa Drive. Investigator Newbill said that Martin was not reliable enough to get a search warrant issued because "[Martin] was just beginning [to work as a confidential informant]."

On cross-examination, Investigator Newbill admitted that Martin gave him the information about Clark around the time that Investigator Kemper obtained the search warrant for the residence at 15 Villa Drive. He also admitted that he talked to Investigator Kemper about the fact that Martin could corroborate the statements made by Hicks. Investigator Newbill said that Investigator Kemper's affidavit relied on just one confidential informant, rather than both of the informants, because Martin had not "done anything to deem himself reliable." Investigator Newbill said that he did not pay Martin for the information about Clark. Instead, he said that Martin was compensated for his work as an informant by avoiding jail time for his cocaine offense. However, Investigator Newbill acknowledged that Martin eventually served time in jail for this offense because Martin "gave some information but not a lot." He also acknowledged that Martin worked as a confidential informant for "a limited period" until he had to serve his cocaine sentence in incarceration. Investigator Newbill could not recall the period of time that Martin was providing information to him as a confidential informant. On redirect examination, Investigator Newbill stated that while he was helping search the residence at 15 Villa Drive, he received a call from Martin asking if he could get paid for "hitting the place[.]"

At the end of the hearing, the trial court determined that Terry Hicks was the confidential informant referenced in Investigator Kemper's affidavit and that Hicks was reliable. After looking at the four corners of the document, the court found that there was a rebuttable presumption of probable cause. The court then made the following findings:

> An affidavit which is sufficient upon its face may be impeached in two different circumstances; number one, when a false statement is made with intent to deceive the court . . . whether the statement is material [or immaterial] to the establishment of probable cause. I haven't found today a particularly false statement. You have to weigh the credibility of the witnesses, and I have Mr. Martin weighing in with the others who have testified, including [Investigator Kemper who] made the statement, and the affidavit itself, on the four corners of the document. Or, number two, when a false statement is recklessly made and is essential to the establishment of probable cause. Recklessness may be established by showing that a statement was false when made and that the affiant did not have reasonable grounds for believing it at the time it was made.

Well, the Court can't find [that] that's shown here. The reliability of the confidential informant is established on the four corners of the document, and there's been nothing to show otherwise, looking to the definition of recklessness as set forth. I just cannot find under the circumstances that there is a basis to suppress the evidence in this case as requested by [Clark] in the motion. There's been some speculation made about some marital relationship or some woman married and going with another man, but there's nothing to attack what is in the four corners of this document today from the proof heard.

The trial court then denied the motion to suppress.

At the conclusion of the suppression hearing, Martin was arrested for aggravated perjury because of the statements he made under oath at the hearing. Martin was later released, although the charges, which were in another court, remained outstanding at the time of Clark's trial.

**Trial.** Sergeant Gary Benton of the Jackson Police Department testified that he was a member of the tactical unit that executed the search warrant at 15 Villa Drive on March 20, 2009. Sergeant Benton said that the tactical unit met at approximately 6:00 a.m. that morning for twenty to thirty minutes before executing the search warrant in this case. He stated that Clark was the only individual inside the residence at the time of the search and that Clark was standing in the hallway just outside the bathroom door in his boxers and a T-shirt when he was taken into custody.

Investigator Rodney Clark of the Jackson Police Department testified that he was present during the execution of the search warrant and that he was responsible for going to the front of the residence at 15 Villa Drive to ensure that no one exited the front door as the tactical unit was attempting to enter the residence through another door. As he was standing at the front door, he looked through a window and saw an individual move toward the door where the police were knocking before running to the back of the residence. Investigator Clark notified the tactical unit that he had seen someone move inside the residence.

Investigator Kemper of the Jackson Police Department testified that he was also present during the execution of the search warrant at 15 Villa Drive. He said that he read the search warrant to Clark before the officers began searching the residence. During the search, the officers recovered the following evidence: a plastic bag containing 2.6 grams of crack cocaine; a folded $100 bill covered in a white powdery residue; $499 in cash; $4000 in cash bundled with rubber bands; one hydrocodone pill; three sets of digital scales; two boxes of plastic sandwich bags found on the dining room table and near the couch; a marijuana grinder; a metal marijuana pipe; a cigar splitter; six bottles containing hydrocodone; an empty

prescription bottle of Tussionex, a medication containing hydrocodone; a black leather purse containing several empty prescription bottles of Tussionex; a wallet containing Clark's driver's license, a five dollar bill behind the bookshelf in the den; two ledgers containing names and amounts; a police scanner, a letter addressed to Clark at the 15 Villa Drive address, a Taurus .38 special revolver loaded with four bullets found under the couch in the den; nine .32 cartridges for a .32 caliber firearm; one .38 special cartridge; and three pieces of mail addressed to Delisa Good at 15 Villa Drive.

Investigator Kemper stated that the digital scale found on the kitchen counter had a white powdery residue on it, which indicated to him that the scale had been used for weighing narcotics during the packaging process prior to being sold. A second scale was found in a birdhouse in the backyard. A third digital scale was found in a kitchen cabinet. Investigator Kemper stated that cigar splitters, like the one recovered during the search, were commonly used to remove the tobacco from a cigar and replace it with marijuana, which is commonly called a "blunt[.]" He stated that jeans, containing the 2.6 grams of crack cocaine, the $100 bill, and the $499 in cash, were found on the floor in front of the dresser in the master bedroom. On top of the dresser was a wallet containing Clark's driver's license and the bundled $4000 in cash. Investigator Kemper stated that the police department often saw "large denominations of money packaged with rubber bands" in areas where drug sales were high. He also said that large amounts of cash typically indicated that an individual was a "drug trafficker" rather than a "drug user[.]" Moreover, he stated that the two ledgers indicated "a drug trafficker instead of a drug user" because drug dealers often kept "records of people that they [had] fronted or loaned dope to or people that owe[d] them money for different weights or amounts of dope." Regarding the police scanner, Investigator Kemper said that it was "very common for people involved in selling narcotics to keep a scanner with them" because it allowed them to know where the police were immediately. He said that the piece of mail addressed to Clark at the 15 Villa Drive address had been opened and contained a letter regarding a service contract on a 2002 Chevrolet Trail Blazer. When Investigator Kemper asked Clark about the gun that had been recovered, Clark told him that he had purchased it from a pawn shop, that the gun was legal, and that he was not legally prohibited from possessing it. Investigator Kemper stated that the three digital scales, the plastic sandwich bags, the large amounts of cash, and the gun that were recovered were consistent with a drug dealer rather than a drug user.

On cross-examination, Investigator Kemper acknowledged that Hicks was the confidential informant who provided him with the information included in his affidavit to obtain the search warrant in this case. He also said that Martin was a confidential informant but that Martin "was in the process of trying to become reliable." Investigator Kemper said that Hicks's motivation for working as a confidential informant was that he had outstanding criminal charges.

Investigator Kemper admitted that none of the evidence recovered from the residence at 15 Villa Drive was fingerprinted. In addition, he acknowledged that no lab report, fingerprint analysis, or DNA analysis connected Clark to the marijuana pipe, the glass bottles, the hydrocodone pill, the digital scales, the police scanner, or the ledgers. Moreover, Investigator Kemper acknowledged that he did not conduct a handwriting analysis to determine whether Clark was the individual who had written in the two ledgers recovered at the residence.

Investigator Kemper admitted that the utilities for the residence at 15 Villa Drive were in Delisa Good's name. He said that his investigation revealed that the 2002 Chevrolet Trail Blazer parked outside the residence was registered to Clark at 15 Villa Drive and that Clark lived at that address with Delisa Good and their small child. Investigator Kemper acknowledged that defense counsel had given him the affidavit from James Simmons, in which Simmons stated that the crack cocaine, the three digital scales, the marijuana pipe, and the marijuana grinder recovered belonged to him. However, Investigator Kemper said he never investigated Simmons regarding the charges in this case. Morever, he said he never asked Clark to try on the jeans containing the crack cocaine, the $100 bill, and the $499 in cash. He acknowledged that the address listed on Clark's driver's license was 41C Rosewood Circle.

On redirect examination, Investigator Kemper stated that he did not typically attempt to lift fingerprints in drug cases because it was often difficult to lift fingerprints from plastic bags, firearms, or objects that had been handled by several different people because the prints were often smudged. He also stated that although he received Simmons's affidavit from defense counsel, Simmons never contacted him to talk about this case. Investigator Kemper said it was "very common for people involved in trafficking narcotics to use multiple addresses, multiple vehicle registrations, [and] multiple bank accounts in other people's names to avoid detection."

Jennifer Sullivan, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified that the rock-like substance found in the pocket of the jeans in the residence tested positive for cocaine and weighed 2.6 grams. She also stated that the liquid in the Tussionex bottles tested positive for hydrocodone. Finally, Agent Sullivan stated that the white tablet recovered at the residence tested positive for hydrocodone.

Amanda Jordan, an employee with BancorpSouth, testified that Clark had an account at BancorpSouth with an address of 41 Rosewood Circle, Apartment C, Jackson, Tennessee. She stated that BancorpSouth had no other addresses for Clark.

Ted Welch, an employee with the Jackson Energy Authority, testified that the company's records from January 1, 2009, to April 16, 2009, showed that the utilities for the residence located at 15 Villa Drive were in Delisa Good's name. He stated that no other individuals were listed as account holders for the utilities at that address during that period.

Delisa Good testified that in March 2009 she was living at 15 Villa Drive. She stated that Clark's name did not appear on her lease for this property. Good said that when her car's transmission stopped working, she asked Clark to purchase a car for her because of her poor credit. She said that Clark ultimately purchased a 2002 Trail Blazer in his name for her primary use.

Good also said that she received a check for a tax refund anticipation loan in the amount of $5463.55. She stated that she cashed this check and kept the cash at her residence at 15 Villa Drive. She explained that she intended to go shopping and pay a few bills with this money before depositing the remainder of the cash in the bank. She claimed that the $4000 in cash that the police found during the search belonged to her and represented the unspent portion of her tax refund anticipation loan.

Good said that the $499 found in the jeans in the residence could have belonged to her brother or her uncle. She also said that James Simmons, Clark's uncle, often visited her house. When shown a picture of the jeans recovered in the search of her residence, she was unable to identify the person to whom the jeans belonged.

Good said that to her knowledge, Hicks had never been a visitor to her home. However, she said that Martin would often visit her home when Clark was present. Good denied that Clark was living with her at 15 Villa Drive in March 2009. Although she and Clark had just had a child together, she stated that they were not dating one another at the time of the search. She said that Clark would come by her house periodically and would occasionally spend the night. Good said that Clark spent the night at her house on March 19, 2009, which was why he was present during the search of her residence on March 20, 2009. She stated that she was unaware of a gun at her residence until she learned that a .38 revolver had been found during the search. Good admitted that the marijuana pipe and marijuana grinder recovered in the search belonged to her. She also admitted that the plastic sandwich bags belonged to her because she had a thirteen-year-old son who took his lunch to school. However, she denied that the three digital scales, the Tussionex bottles, and the crack cocaine belonged to her. Good said that she would not have tolerated someone selling drugs at her home, especially since her three-month-old child was living there, and that she did not have any reason to believe that drugs were being sold out of her residence.

On cross-examination, Good maintained that she spent exactly $1436.55 of her tax refund anticipation loan, leaving her $4000 in cash. She said that she was unsure whether the jeans recovered in the search belonged to Clark. Good said that when she left her residence at 6:00 a.m. on March 20, 2009, Clark and Simmons were still at her residence. She said she knew nothing about the three digital scales or the white powdery substance on the scales. She also said she did not know why a digital scale would have been hidden in her backyard at the time of the search. She denied having knowledge of the Tussionex bottles, the police scanner, or the two ledgers.

Kim Buckley, the administrator of elections in Madison County, testified that she oversaw voter registration as a part of her duties. She stated that she received Clark's application to be a registered voter on May 30, 2007, and that the address listed on his application was 41 Rosewood Circle, Apartment C, Jackson, Tennessee. She acknowledged that Clark could have moved from the address listed on his application.

Doneida Harris, an employee with the Tennessee Department of Safety, testified that Clark's address on his driving record was 41-C Rosewood Circle, Jackson, Tennessee. She stated that she had no documentation showing that Clark's address had changed. Harris acknowledged that it was Clark's responsibility to notify the Department of Safety if his address changed.

James Simmons, age sixty, testified that he was Clark's uncle. He said he was currently incarcerated for the charge of simple possession of drug paraphernalia. He acknowledged that he was addicted to cocaine and that he had sold cocaine in the past to support his habit. Simmons stated that he often visited the residence leased by Delisa Good three or four times a week. He said that the crack cocaine found at Good's residence in March 2009 belonged to him. He said he placed the crack cocaine into some jeans in the house that were not his jeans because he did not want to carry the crack cocaine with him on the street. He also admitted that the three digital scales and the Tussionex bottles belonged to him. He said he accidentally left the scales and crack cocaine at Good's residence. Simmons stated that Investigator Kemper never talked to him even though he signed an affidavit admitting that the aforementioned items recovered from 15 Villa Drive belonged to him.

On cross-examination, Simmons stated that Clark's attorney contacted him after Simmons told Clark in May or June 2009 that the aforementioned items recovered in the search belonged to him. Simmons admitted that he did not sign the affidavit regarding his ownership of these items until three months after the search. He also admitted that he never turned himself into the police regarding this contraband. Even though he testified that he left Good's residence at 6:00 a.m. on March 20, 2009, he acknowledged stating in his affidavit

that he left Good's residence at 4:00 a.m. on March 20, 2009. Simmons was unable to identify the particular pocket of the jeans into which he placed the crack cocaine. He was also unable to describe the digital scales that he claimed belonged to him. He said that the only reason he had the scales was so that he could sell them to someone else for a profit. Simmons denied that he had been weighing cocaine on the digital scales and asserted that if there was a white powdery residue on the scales it had been there that when he got them. Simmons also denied that the $100 bill covered in white powder belonged to him and that he was trying to take Clark's criminal charges because Clark was his drug dealer. He asserted that he was having a hard time serving time for his existing charge and that he was not going to be dishonest about facts that would cause him to serve additional time. Simmons admitted stating in his affidavit that the marijuana pipe and the marijuana grinder belonged to him. However, he testified that the marijuana pipe did not belong to him and asserted that he did not smoke marijuana. Then he stated, "[If] it's wrote [sic] in the affidavit[,] I'm not going to try to deny [it]. How can I take that out and leave the rest of it in. The pipe wouldn't make much difference, you know, marijuana pipe with everything else they had already got." He then stated that the marijuana pipe belonged to him and that he planned on selling it and the scales for a profit  Simmons reiterated that everything on the affidavit belonged to him, although he was unable to identify the specific items listed in the affidavit. When asked whether he merely signed the affidavit the defense attorney drafted, he responded, "I signed what's the truth. [Clark's attorney] wasn't going to jeopardize [him]self for me [for] draw[ing] up something for me to sign to benefit him."

Clark, the Defendant-Appellant, testified that he was a full-time student at Tennessee Technology Center studying "heating and air" and had received two grants to cover his studies. He stated that he had three daughters, including the daughter he had with Delisa Good. Clark said that in March 2009 he was living in an apartment with his grandmother at 41-C Rosewood Circle. However, he said that he was also spending the night with a girlfriend, someone other than Delisa Good, during that time period. Clark said that in March 2009, he and Good were "really meeting" because he was visiting his daughter. He said that he often sent his mother to Good's residence to help with his daughter so that he "wouldn't have to go." He claimed he "wasn't even really dealing with [Good]" at the time of the search. Clark stated that he had come over to Good's home on March 19, 2009, after dinner and had spent the night. He said that he had been asleep when the search was executed at 6:45 a.m. on March 20, 2009. When he heard the police, he jumped up in the living room and stood there with his hands up. Clark said that he had a gun in Good's home because he had just purchased the gun for protection at a pawn shop and did not have a permit to carry it.

Clark stated he knew nothing about the crack cocaine until the police found it in a pair of jeans in the back bedroom. He said that although his wallet was in the back bedroom, his

pants were with him in the living room. He denied knowing to whom the jeans belonged. He also denied knowing anything about the $499 in cash. Clark said that no one from the police department ever asked him to try on the jeans to see if they belonged to him. At the time of the search, the police did not ask him if the jeans were his and did not allow him to see the jeans.

Clark said he knew Hicks because they went to high school together and because he dated Hicks's wife while Hicks was in jail. Clark said Martin informed him that Hicks knew about Clark and Hicks's wife and that Hicks "didn't appreciate it" because Clark and Hicks had grown up together. Clark said that he barely knew Hicks and that he and Hicks were not friends. He also volunteered that Hicks had "never been to [his] house." Clark also said Martin informed him that Hicks was "very mad at [him] and the way he [was] going to get back at [him was] he [was] going to tell the narcotics [officers] that [Clark had] drugs or [Clark was] in town with drugs." Clark said it was unbelievable that Investigator Kemper would not even conduct an investigation based on Hicks's information before obtaining the search warrant. Clark also said that Martin informed him that Hicks was responsible for the search of Good's residence:

> I was running with Mr. Hicks['s] roommate, Mr. Martin. And Mr. Martin was telling me everything that was going on. That's how we already knew who the informant was before we got to court because at some [point] . . . Mr. Hicks and Mr. Martin s[a]t down there and discussed all this together that [Mr. Hicks] was going to try to get me back some kind of way for dealing with his wife.

Clark said that after his arrest, he immediately tried to discover the individual to whom the crack cocaine belonged. He talked to Simmons, who admitted that the crack cocaine belonged to him and informed him that he would take the criminal charge related to it. Clark said that shortly after his arrest, Martin came to talk to him:

> Mr. Martin . . . told me that – he said – see, me and Mr. Martin was friends. Not me and Mr. Hicks. Mr. Hicks['s] name is on the [affidavit], but I guess the only reason Mr. Hicks['s] name [is] on the [affidavit is] because his credibility [was] suppose[d] to be so strong. Because he done bust[ed] people in the [past].

> So[, after the search,] Mr. Martin came to me and said look here, me and you been friends a long time. I got something I want to tell you. I said, what is it. Because I was already thinking – I was thinking – I didn't know what had happened. But basically he was like look here, Terry Hicks is at the

-13-

house. He['s] always asking me questions [about] what's going on when I leave your house.

Now, he just came in the house and laughing and talking about, yeah, I just busted Demetrius [Clark]. I just sent the narcotics over there to get him. He crossed me out so I'm going to cross him back out.

So basically what Mr. [Martin] was doing he was coming to tell me what [Investigator] Kemper was doing because [Investigator] Kemper didn't pay him his thousand dollars. [Investigator] Kemper promised Mr. Martin a thousand dollars if he ke[pt] feeding him information about me.

See me and Mr. Martin was friends. He was hanging out at my house. Not Mr. Hicks. So after [Investigator] Kemper didn't give him the thousand dollars I guess he was like, well, I don't even want to work for y'all no longer. So he came and told me everything that was going on.

Clark said that he never had any dealings with Hicks and that Investigator Kemper knew there was nothing linking Clark to Hicks. He also said that Hicks and Martin were informants at that time but that Martin's credibility "wasn't good enough to make all those things happen." Clark said that Martin was coming "over [to] my house . . . scratching his head wondering should I try to get my friend in trouble or not and thinking about the thousand dollars at the same time." Then Martin "was telling Mr. Hicks about everything and [Investigator] Kemper knew that they couldn't get a warrant to kick that address door in with Mr. Martin's name" so Investigator Kemper "acted like it was Mr. Hicks that was over[,]" even though Martin was the one who had been in Clark's house. Clark denied selling drugs at 15 Villa Drive. He asserted that his fingerprints would not have been on any of the items recovered in the search if the police had dusted them for fingerprints.

On cross-examination, Clark was unable to state what the abbreviation "HVAC" meant, even though he claimed that he was a full-time student in the HVAC program. He admitted that he purchased a 2002 Trail Blazer but asserted that he had to put it in his name because his "girlfriend[,]" Good, could not purchase the car in her own name. He stated that he put the 15 Villa Drive address on the car's purchase documents because that was the address where Good was going to be paying the note and where the vehicle was going to be located if they needed to repossess it but not because that was the address where he was living at the time. Clark admitted that he had received a ticket driving the 2002 Trail Blazer but claimed that he was getting the vehicle "tuned up" for Good. Although Clark admitted that 15 Villa Drive was his girlfriend's house, he claimed that he slept on the couch when he spent the night. Clark denied that the jeans that were recovered in the back bedroom

-14-

belonged to him but admitted that his wallet was found in the same room. Clark asserted that Investigator Kemper, Hicks, and Martin conspired to frame him in this case and that none of the things recovered from the 15 Villa Drive address belonged to him. Clark denied that Simmons, his uncle, planted the evidence for which he was arrested. He also denied that he was Simmons's drug dealer and that he was using Simmons in an attempt to avoid being convicted of these charges.

On redirect examination, Clark denied forcing Simmons to sign an affidavit admitting responsibility for the evidence recovered from the search. He also denied having anything to do with Simmons's current charges and claimed that Simmons was currently in jail because he used drugs.

## ANALYSIS

**I. Motion to Suppress.** Clark contends that the trial court erred in denying his motion to suppress because the affidavit upon which the search warrant was based contained an intentional and/or reckless misrepresentation of a material matter. Clark argues that this misrepresentation was the fact that Investigator Kemper failed to mention Martin in his affidavit and failed to inform the trial court that Martin had provided allegedly contradictory information to that given by Hicks, whose statements were included in the affidavit. The State responds that Clark has waived consideration of this issue because he failed to include it in his motion for new trial and that this issue is not subject to plain error review. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). We agree with the State that the trial court's denial of the motion to suppress does not constitute plain error.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

-15-

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

In State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978), the Tennessee Supreme Court held:

> [T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

"In order to be 'essential to the establishment of probable cause,' the false statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause." State v. Norris, 47 S.W.3d 457, 469 (Tenn. Crim. App. 2000) (citing State v. Tidmore, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980)).

Investigator Kemper's affidavit stated that within the last seventy-two hours, Hicks informed him that he "had observed a large amount of cocaine . . . for resale" at the residence at 15 Villa Drive and that Clark resided there with his girlfriend and small child. The affidavit also stated that Hicks had "been reliable in the past in that he . . . had provided information which ha[d] resulted in the recovery of approximately 130 grams of cocaine, over 20 grams of crack cocaine, and 23 pounds of marijuana."

At the suppression hearing, Clark presented the testimony of Martin, who stated that Hicks had never been inside the residence at 15 Villa Drive and could not have personally observed anything inside that residence seventy-two hours prior to the time the affidavit was presented. Martin also stated that he had never seen large amounts of cocaine at 15 Villa Drive and that Hicks had a vendetta against Clark because Clark had been involved with Hicks's wife. Clark admitted Martin's affidavit, which in addition to the aforementioned information, stated that Hicks had been pressured by the police to "set up somebody" if he wanted to help himself in his drug case; that in the two weeks prior to March, 18, 2009, the

date the affidavit was filed, Martin was with Clark every day; that Hicks had asked Martin several questions about Clark selling drugs; that Martin "didn't know anything" about Clark selling drugs; that in the two weeks prior to March 18, 2009, Martin had never seen Hicks at 15 Villa Drive and had never seen Hicks with Clark; and that Hicks had bragged to Martin that he had set up Clark.

At the end of the hearing, the trial court determined that the affidavit did not include a false statement made with the intent to deceive the court, whether material or immaterial to the issue of probable cause, and did not include a false statement, essential to the establishment of probable cause, recklessly made. The court also determined that Hicks's reliability had been established on the four corners of the affidavit. Ultimately, the court found that there was no basis to suppress the evidence recovered pursuant to the search warrant.

An appellate court may consider the proof presented at the suppression hearing and the trial when determining whether the trial court properly denied a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; Yeargan, 958 S.W.2d at 629.

The United States and Tennessee Constitutions state that search warrants shall issue only upon probable cause. U.S. Const. amend. IV; Tenn. Const. Art. 1, section 7. "As a general rule, a search warrant shall be issued only on the basis of an affidavit, sworn before a 'neutral and detached' magistrate, which establishes probable cause for its issuance." State

v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999) (quoting State v. Jacumin, 778 S.W.2d 430, 431 (Tenn. 1989)) (citing State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992)). A showing of probable cause generally requires "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Johnson, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993) (citing Lea v. State, 181 S.W.2d 351, 352 (Tenn. 1944)). "In order to establish probable cause, an affidavit must set forth facts from which a reasonable conclusion may be drawn that the contraband will be found in the place to be searched pursuant to the warrant." Norris, 47 S.W.3d at 470 (citing State v. Longstreet, 619 S.W.2d 97, 99 (Tenn. 1981)). A search and seizure may be rendered illegal if the search warrant "was issued on evidence consisting in material part of willful or reckless misrepresentations of the applicant to the issuing magistrate, resulting in a fraudulent procurement[.]" Tenn. R. Crim. P. 41(g)(3). "A person aggrieved by an unlawful or invalid search or seizure may move the court pursuant to Rule 12(b) [of the Tennessee Rules of Criminal Procedure] to suppress any evidence obtained in the unlawful search or seizure." Tenn. R. Crim. P. 41(g).

We conclude that the record supports the trial court's ruling that Investigator Kemper's affidavit was not impeached and that the evidence recovered from the search should not be suppressed. Because Hicks, a criminal informant, was the source of the information establishing the probable cause in the affidavit, this court must follow the two-prong Aguilar-Spinelli test adopted by the Tennessee Supreme Court. Jacumin, 778 S.W.2d at 436. This test requires that "the magistrate must be informed of both (1) the basis for the informant's knowledge, and either (2)(a) a basis establishing the informant's credibility or (2)(b) a basis establishing that the informant's information is reliable." State v. Ballard, 836 S.W.2d 560, 562 (Tenn. 1992) (citation omitted). "Probable cause may not be found until both prongs have been independently considered and satisfied." Id. (citation omitted).

Clark cites State v. Houseal, 667 S.W.2d 108, 110 (Tenn. Crim. App. 1983), for the rule that the pertinent issue in a suppression hearing is not "whether the informant had lied, but whether the affiant had reasonable cause to rely on the information received from him and, based on that information, set out probable cause in the affidavit to the warrant without falsification on his part." The record shows that Investigator Kemper's affidavit stated that within the previous seventy-two hours, Hicks had informed him that he had been to 15 Villa Drive and "had observed a large amount of cocaine . . . for resale" and that Clark resided at the residence with his girlfriend and small child. The affidavit also stated that Hicks had provided reliable information which had led to the recovery of drugs in other cases. Investigator Kemper testified that the first time he became aware of the possibility that Hicks had a vendetta against Clark was when he received Martin's affidavit, which was "months after" his affidavit was sworn and the search warrant was executed. He also testified that at the time he swore to his affidavit, the information regarding "Clark's cocaine trafficking" had been corroborated by Hicks and Martin, although Martin was not considered reliable at

-18-

that time. Moreover, he testified that although he had the benefit of the information from Martin at the time that he presented his affidavit, he did not rely on Martin because Martin's reliability had not been established. The record shows that Investigator Kemper had reasonable cause to rely on the information received from Hicks. See Houseal, 667 S.W.2d at 110.

We conclude that Clark failed to establish all five factors required for plain error. See Smith, 24 S.W.3d at 282. The trial court properly determined that the affiant did not make a false statement with the intent to deceive the court and did not recklessly make a false statement which was essential to the establishment of probable cause. The court also properly determined that Hicks's reliability had been established. The record supports the trial court's factual findings as well as the court's legal conclusion. Therefore, Clark has not shown that a clear and unequivocal rule of law was breached, that a substantial right was affected, or that consideration of the alleged error is necessary to do substantial justice.

**II. Presenting a Defense.** Clark argues that the combined effect of the State's arrest of Martin for aggravated perjury following his testimony at the suppression hearing and the prosecutor's intimations to Martin that he would be facing additional criminal charges if he testified at trial deprived him of his due process right to present a defense. Clark also argues that the State's actions in arresting and intimidating Martin amounted to prosecutorial misconduct and prejudiced his case. Clark alleges that Martin's testimony would have corroborated Simmons's testimony and would have impeached Investigator Kemper's credibility regarding his failure to properly investigate Clark prior to presenting his affidavit for the search warrant. He also claims Martin's testimony would have corroborated his claim that he did not reside at 15 Villa Drive and did not "possess or deal drugs from that location."

The State responds that notwithstanding Martin's refusal to testify, Clark failed to establish that the prosecutor's actions prevented Martin from making a voluntary decision to testify and that the State pursued the aggravated perjury charge against Martin with an improper motive. The State asserts that Martin was present at trial pursuant to Clark's subpoena and that Martin was available, even though he was unwilling, to testify. Moreover, the State contends that other testifying witnesses sufficiently established Clark's defense theory. We agree that Clark was not deprived of his due process right to present a defense and that the State's actions in this case did not constitute prosecutorial misconduct.

Here, after the defense had presented their other witnesses at trial, defense counsel informed the court outside the presence of the jury that he had recently talked to Martin. He reminded the court that the last time Martin testified at Clark's suppression hearing, "he made it to the back door of this courtroom [before he] was arrested by Officer Kemper with no papers, no formal charges having been fi[l]ed, almost as if a message were being sent to

him that he . . . was not going to take that stand without some sort of ramifications for having testified on behalf of Mr. Clark." Consequently, defense counsel said that Martin was

> extremely reluctant to testify because he anticipates if he testifies, [the police will] arrest him for something else, and as a result of what occurred earlier, quite frankly, I don't know that that wouldn't happen. So as a result, [Martin] is intimidated to take the stand to testify because of the last efforts taken by the – primarily the police, and so we're in a quandary because [we have] a very, very reluctant witness who is here under subpoena who does not wish to testify, although his statement to me last night was that he would stand by what his statement was in his affidavit that he did and that he would not tell a lie, would tell the truth, and he said, "I told the truth the last time and I got charged with aggravated perjury."

Defense counsel continued:

> So I'm not sure what to do . . . because I've got a witness that I feel like perhaps needs to take the stand to testify to make some clarification on testimony that came out yesterday, but given the circumstances of what they did to him last time he came to the courtroom, I understand why he's intimidated by the process, and I understand why he's intimidated to come in here today.

The trial court informed defense counsel that he should do what was in Clark's best interests and that defense counsel was free to call or not call Martin, who was present at trial pursuant to Clark's subpoena. Defense counsel stated that he needed to talk to Martin and Clark and reminded the court that Martin was not represented by his own attorney in this matter. After a short break, defense counsel asked the trial court to allow him to question Martin outside the presence of the jury. He said that Martin had not expressed any concerns to him about incriminating himself but did feel intimidated because he was arrested after his testimony at the suppression hearing. The court informed defense counsel that Martin was required either to invoke the Fifth Amendment or to testify, and it was defense counsel's decision as to whether he wanted to call Martin as a witness. Defense counsel again requested that he be allowed to question Martin outside the presence of the jury as to Martin's intentions, and the court responded that defense counsel could question Martin only as to whether Martin was going to refuse to answer based on the Fifth Amendment and that he could not question him about the details of his testimony.

Martin was called to the stand outside the presence of the jury, and the court informed him that he was going to be asked questions regarding Clark's case and his prior testimony

at the suppression hearing. Martin responded that he did not want to be a witness in this matter. The court then informed Martin that he could not be forced to give evidence against himself and that he could invoke the Fifth Amendment in response to questions that would incriminate him. Martin said that he was sick and wanted to avoid going to jail and then stated that he would invoke the Fifth Amendment regarding any issues that were incriminating. Defense counsel stated that his questions to Martin "would relate to whether or not Mr. Hicks observed the things that Mr. Hicks said he did[,]" which would not necessarily be incriminating to Martin. The court noted that Martin could be "incriminating himself regarding [the perjury charge] that's pending." Defense counsel said that it was the defense's position that Martin would not be incriminating himself because the statements he would be giving would be "related to observations concerning what Mr. Clark was or was not doing, based on his involvement with Mr. Clark at that time." At that point, the court confirmed with the State that Martin was facing aggravated perjury charges. Then defense counsel stated the following:

> I'm very familiar with the facts and the circumstances. I'm very familiar with the definition of aggravated perjury, and I can tell the Court now, it doesn't apply in this situation. That's the position Mr. Clark takes related to why this witness is now put in the position that he is, because of the State's efforts to try to prohibit him from being able to testify. He has a right to take the Fifth. I can't stop him from taking the Fifth, but that now will interfere with my ability to defend [Clark] because the State's taking the steps it's taken in this case to, as I stated earlier, intimidate him from being able to testify.

The court asked the State what its opinion was regarding Martin's right to invoke the Fifth Amendment, and the State asserted that Martin was not charged with aggravated perjury "as a tactic in this case" but rather because Martin "committed perjury on that witness stand, and that is still a pending charge." The court reminded the State that it would have to prove beyond a reasonable doubt that Martin gave false statements under oath in a judicial proceeding, and the State asserted that it intended to present that proof in Martin's aggravated perjury case. In addition, the State "absolutely" agreed that Martin's testimony could be used against him in the pending aggravated perjury case. Then the following exchange occurred outside the presence of the jury:

| The Court: | [Defense counsel], are you going to ask a question at a time and let me rule on them as we go? |
| [Martin]: | I don't want to be asked a question. |
| The Court: | What's your pleasure? |

[Defense Counsel]: I think the Court heard the witness, Your Honor.

The Court: Well he can only take the Fifth on matters that would involve a response that would incriminate him.

[Defense Counsel]: Your Honor, I don't have any choice. I mean, I can't put him on the stand and have him testify to that. The answer is no. I'm not going to do that because it is obviously going to be prejudicial to Mr. Clark. So the objective has been accomplished. So I can't call him, don't intend to and we can let him go, and we can go ahead and close our case at this point.

When the jury returned to the courtroom, the defense rested its case.

First, Clark argues that the State's actions in arresting and intimidating Martin deprived him of his due process right to present a defense. The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution afford all criminal defendants the right to a fair trial. The Tennessee Supreme Court has held that a defendant shall not be deprived of his or her right to present a defense:

> Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. See Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000). In Washington v. Texas, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed 2d 1019 (1967) the United State Supreme Court stated:
>
> > The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.
>
> 388 U.S. at 19, 87 S. Ct. 1920.

-22-

State v. Flood, 219 S.W.3d 307, 315-16 (Tenn. 2007).

We agree that a defendant's right to present a witness's testimony in his defense must give way to that witness's invocation of his or her Fifth Amendment right against self-incrimination. See Washington, 388 U.S. at 23 n.21. However, the witness may not invoke a blanket Fifth Amendment right; instead, the defendant must invoke this right "on a question by question basis." State v. Dooley, 29 S.W.3d 542, 551 (Tenn. Crim. App. 2000); State v. Phillip Blackburn, No. W2007-00061- CCA-R3-CD, 2008 WL 2368909, at *11 (Tenn. Crim. App. June 10, 2008).

In Webb v. Texas, 409 U.S. 95, 97-98 (1972), the United States Supreme Court determined whether the trial court's communication with a potential witness at trial outside the presence of the jury amounted to unconstitutional intimidation:

> The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole. At least some of these threats may have been beyond the power of this judge to carry out.

In reversing the judgment, the Court concluded that "the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." Id. at 98. It further concluded that the "judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." Id. Similarly, in U.S. v. Thomas, 488 F.2d 334, 335 (6th Cir.1973), a Secret Service agent informed a potential witness in an ex parte communication that he would, in fact, be prosecuted if he testified. The Sixth Circuit, in reversing the judgment, concluded that "the Government's action . . . substantially interfered with any free and unhampered determination the witness might have made as to whether to testify and if so as to the content of such testimony." Id. at 336. However, in Davis v. Straub, 430 F.3d 281, 287 (6th Cir. 2005), the Sixth Circuit held that a prosecutor's act of informing a witness of the right against self-incrimination did not constitute unconstitutional intimidation. In that case, "Davis sought to have witness Damaris Jourdan testify as to Jourdan's prior statements, which tended to exculpate Davis, made to police and a private

investigator." Id. at 283. Prior to Jourdan taking the witness stand, the prosecutor informed the trial court, in the presence of Jourdan, that "Jourdan was a suspect and should consult with a lawyer before testifying." Id. After talking to his lawyer, Jourdan invoked his Fifth Amendment right against self-incrimination. Id. The Sixth Circuit affirmed the judgment, concluding that because the prosecutor merely "requested a sidebar with the judge, wherein he informed the court that the witness was a suspect and should be informed of his constitutional rights[,]" his "conduct [did] not rise to the level of intimidation present in Webb and Thomas." Id. at 287.

Second, Clark argues that the State's actions in arresting and intimidating Martin amounted to prosecutorial misconduct and prejudiced his case. Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)). This court must consider the following factors when determining whether the conduct of the prosecutor was so improper as to negatively affect the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Clark has failed to establish that he was denied the opportunity to present a defense or that the conduct of the prosecutor was so improper that it affected the verdict to his detriment. The record shows that Investigator Kemper properly arrested Martin at the end of the suppression hearing upon reasonable cause that Martin had committed the felony of aggravated perjury. See T.C.A. § 40-7-103(a)(4) (stating that an officer may arrest an individual without a warrant "[o]n a charge made, upon reasonable cause, of the commission

-24-

of a felony by the person arrested"). In addition, the trial transcript shows that the prosecutor simply acknowledged that Martin's aggravated perjury charge was pending and that anything Martin testified about at trial could be used against him in the aggravated perjury case. Our review of the record shows that the prosecutor's intent in making these comments, which were in response to questions from the trial court, was not to intimidate Martin but rather to fairly inform him of the potential consequences of his testimony. Consequently, the facts in this case most closely resemble the facts in Davis.

Moreover, we note that defense counsel specifically declined to ask Martin any questions outside the presence of the jury, which foreclosed the possibility of obtaining any information helpful to Clark's case. Defense counsel could have argued that because Martin had already disclosed certain information at the suppression hearing, Martin was precluded from invoking the Fifth Amendment right against self-incrimination regarding the same information at trial. See State v. Stapleton, 638 S.W.2d 850, 855 (Tenn. Crim. App. 1982) ("A witness cannot discontinue testimony as to transactions already disclosed by the witness."), declined to follow in capital sentencing cases State v. Cazes, 875 S.W.2d 253, 265-66 (Tenn. 1994). Additionally, defense counsel failed to require Martin to invoke his right against self-incrimination "on a question by question basis." Dooley, 29 S.W.3d at 551. Furthermore, although the proof the defense sought to present through Martin's testimony at trial was also available through the introduction of Martin's affidavit or the introduction of Martin's testimony from the suppression hearing, neither was offered by the defense at trial.

Finally, the testimony of several of Clark's witnesses indicated that he did not reside at 15 Villa Drive and that he was not a drug dealer. The testimony from Amanda Jordan, Ted Welch, Kim Buckley, and Doneida Harris suggested that Clark did not reside at 15 Villa Drive. In addition, Delisa Good's testimony indicated that Clark did not live with her at 15 Villa Drive, that he did not deal drugs at that address, that the marijuana pipe and marijuana grinder belonged to her, and that Hicks had never been to the residence at 15 Villa Drive. Moreover, James Simmons's testimony indicated that the crack cocaine, the Tussionex bottles, the digital scales, the marijuana pipe, and the marijuana grinder belonged to him. Finally, Clark provided detailed testimony about Martin acting as a confidential informant, about Investigator Kemper's use of Martin's information rather than Hicks's information in his affidavit because Hicks had never been inside the residence at 15 Villa Drive, and about the fact that Investigator Kemper, Martin, and Hicks framed him. Our review of the record shows that Clark presented abundant testimony to support his alternate defense theories. We conclude that Clark was not deprived of his due process right to present a defense and that the State's conduct in this case did not constitute prosecutorial misconduct.

**III. Sufficiency of the Evidence.** Clark argues that the evidence is insufficient to sustain his convictions. He claims that the evidence is insufficient because Investigator Kemper failed to test the evidence for fingerprints, because the officers failed to have Clark try on the jeans containing the crack cocaine to see if they would fit, because the officers failed to compare Clark's handwriting to the handwriting on the ledgers found at the residence, and because Simmons testified that the drugs and paraphernalia recovered from 15 Villa Drive belonged to him. The State argues that the evidence is sufficient to sustain Clark's convictions. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23. When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Rice, 184 S.W.3d at 662 (quoting Marable, 313 S.W.2d at 457).

This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

For the first four counts of the indictment, the State was required to prove beyond a reasonable doubt that Clark knowingly possessed cocaine, a Schedule II controlled substance, and hydrocodone, a Schedule III controlled substance, with the intent to sell or deliver them. T.C.A. § 39-17-417(a). The term "possession" refers to "both actual and constructive possession." State v. Cooper, 736 S.W.2d 125 (Tenn. Crim. App. 1987) (citing State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981); State v. Copeland, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984)). "[C]onstructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." Williams, 623 S.W.2d at 125 (internal quotation omitted and citations omitted).

For the firearm count, the State was required to prove beyond a reasonable doubt that Clark "possess[ed] a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." Id. § 39-17-1324(a). A dangerous felony is defined as "[a] felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance . . . ." Id. § 39-17-1324(i)(1)(L). Although not specifically raised by Clark, we note a discrepancy between the language in the indictment and the language in the jury charge and jury verdict form regarding this offense. Here, the indictment charged Clark with "unlawfully possess[ing] a deadly weapon . . . with the intent to go armed during the commission of or attempt to commit a dangerous felony,

to-wit: Possession of Cocaine with Intent to Sell and/or Deliver, in violation of T.C.A. § 39-17-1324(a)[.]" However, the jury charge and the jury verdict form used language from Tennessee Code Annotated section 39-17-1307(d)(2), which states, "A person commits an offense who possesses any deadly weapon with the intent to employ it during the commission of, attempt to commit, or escape from any offense not defined as a dangerous offense by § 39-17-1324." Although the trial court should have charged the jury with pattern jury instruction 36.06(c), which is the jury charge for Code section 39-17-1324(a), it instead charged the jury with pattern jury instruction 36.06(a), which is the jury charge for Code section 39-17-1307(d)(2). See T.P.I. - Crim. 36.06(a), (c). Moreover, the jury charge and the jury verdict form alternatively listed the possession of hydrocodone and the possession of cocaine as the "dangerous felony," despite the fact that the indictment only listed the possession of cocaine as the "dangerous felony." Because the jury convicted Clark of both possession of cocaine and possession of hydrocodone and because the judgment of conviction listed Code section 39-17-1324 and ordered Clark to serve the appropriate sentence of three years with a release eligibility of one hundred percent for the charged offense, we conclude that the aforementioned errors are harmless. See Tenn. R. App. P. 36 ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); Momon v. State, 18 S.W.3d 152, 165 (Tenn. 1999) ("Only a very limited class of errors have been found to be 'structural,' and subject to automatic reversal."); see also T.C.A. § 39-17-1324(g)(1). Finally, for the drug paraphernalia count, the State was required to prove beyond a reasonable doubt that Clark "possess[ed] with intent to use, drug paraphernalia to . . . pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue in violation of this part." Id. § 39-17-425(a)(1).

The evidence presented at trial showed that Clark was found in his boxer shorts and T-shirt in the locked residence at 15 Villa Drive shortly after 6:00 a.m. on March 20, 2009. The aforementioned residence, which was leased by Clark's girlfriend and which Clark was known to commonly visit, contained crack cocaine weighing 2.6 grams, several bottles containing hydrocodone, a hydrocodone pill, digital scales with a white powdery residue, a marijuana pipe, a marijuana grinder, a cigar splitter, a loaded .38 revolver, a police scanner, and cash valued at over $4600. Although the defense presented alternate theories to the jury regarding other individuals who possessed the drugs, drug paraphernalia, and cash recovered during the search, it was the jury's prerogative to reject these defense theories and to accredit the evidence presented by the State. Viewing the evidence in the light most favorable to the State, the jury could have reasonably concluded that Clark possessed the cocaine and hydrocodone with the intent sell or deliver it, that he possessed the gun with the intent to go armed during the commission of these felonies, and that he possessed the drug paraphernalia.

We conclude that the evidence is sufficient to support Clark's convictions.

## **CONCLUSION**

We conclude that the trial court properly denied the motion to suppress, that Clark was not deprived of his due process right to present a defense, and that the evidence is sufficient to sustain the convictions. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE